**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **MIKHAIL MUNENZON,** | Civ. No. 20-14644 (KM)(JBC) |
| **Munenzon,** | |
| **v.** | **OPINION** |
| **PETERS ADVISORS, LLC D/B/A/ VALENTIAM GROUP LLC, AND CARL HOEMKE,** | |
| **Defendants.** | |

<u>**KEVIN MCNULTY, U.S.D.J.:**</u>

Plaintiff Mikhail Munenzon brings this employment action against Defendants Peters Advisors, LLC ("Peters Advisors") d/b/a Valentiam Group, LLC ("Valentiam" or the "Company") and Carl Hoemke. Invoking this Court's diversity jurisdiction, Munenzon asserts state-law claims for breach of contract; fraud in the inducement; unjust enrichment; breach of implied contract; violation of the New Jersey Wage Theft Act ("NJWTA") and the New Jersey wage and hour laws, N.J.S.A. 34:11-2, *et seq.*, N.J.S.A. 34:11-56a, *et seq.* and N.J.S.A. 34:11-57, *et seq.* (collectively, the "NJWHL"); retaliation in violation of the NJWHL; violation of the Connecticut Wage Payment Laws, Conn. Gen. Stat. §§ 31-58, *et seq.* (the "CTWPL"); retaliation in violation of the CTWPL; and retaliation in violation of the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1, *et seq.* ("CEPA").

Defendants filed a motion to dismiss certain claims in the Amended Complaint. Munenzon filed his opposition to that motion and a cross-motion to file a second amended complaint. For the reasons provided herein, I will grant Defendants' motion to dismiss, and will grant in part and deny in part Munenzon's cross-motion to amend.

1

I.      **Summary**[1]

    a. **Factual Allegations**

Defendant Valentiam, a limited liability company whose principal place of business is in Morristown, New Jersey, provides clients with value opinions for business and supports client with expert witness testimony before governmental agencies and in litigation. (Am. Compl. at ¶6, 8.) Valentiam's Valuation Group is involved in "the generation of complex valuation reports for large, blue chip corporations for use in property tax assessments, and, when necessary, litigation." (*Id.* at ¶9.) Defendant Hoemke is a partner at Valentiam and a resident of Texas. (*Id.* ¶¶7, 15, 34.)

Plaintiff Munenzon is a resident of Connecticut and former employee of Valentiam. (*Id.* at ¶ 5.) On November 21, 2016, Economics Partners, LLC ("Economics"), alleged to be Valentiam's predecessor,[2] offered Munenzon a position as a Director in the Valuation Group. (*Id.* at ¶9,13.) Munenzon began employment with Economics on January 2, 2017, and worked remotely from his home in Connecticut from that date until his termination. (*Id.* ¶13.)

---

[1]    Citations to the record will be abbreviated as follows. Citations to page numbers refer to the page numbers assigned through the Electronic Court Filing system, unless otherwise indicated:

    "DE" = Docket entry number in this case.

    "Compl." = Munenzon's Complaint (DE 1)

    "Am. Compl." = Munenzon's Amended Complaint (DE 8)

    "MTD Br." = Defendants' Brief in Support of Partial Motion to Dismiss (DE 11-1)

    "CM Br." = Munenzon's Brief in Opposition to Defendant's Partial Motion to Dismiss and in Support of Munenzon's Cross-Motion to Amend (DE 13-1)

    "Reply" = Defendants' Reply Brief in Support of Partial Motion to Dismiss and Opposition to Munenzon's Cross-Motion to Amend (DE 14)

    "Sur-reply" = Munenzon's Sur-reply Brief in Further Opposition to Defendants' Partial Motion to Dismiss

[2]    The Amended Complaint alleges that Peters Advisors merged with Economics' Valuation Group to form Valentiam in fall of 2018. (Am. Compl. ¶31.)

Munenzon negotiated his hiring with Hoemke, who, at the time, was a partner at Economics. (*Id.* at ¶15.) Munenzon reported to Hoemke throughout his employment with Economics and later with Valentiam. (*Id.*) Munenzon was hired "to help grow the business by relieving Hoemke of a substantial amount of the day-to-day work" of "preparing numerous complex reports for clients." (*Id.* at ¶16.) Additionally, "Hoemke expected Plaintiff to help with existing valuation projects and lead new projects that fit Plaintiff's prior valuation experience." (*Id.* at ¶17.)

Prior to Munenzon's employment, an outside contractor assisted Hoemke in updating and preparing valuation reports manually, allegedly the usual process in the industry at the time. (*Id.* at ¶18.) The Amended Complaint alleges that the manual process "was time-consuming and led to high costs, many errors, delays and unhappy clients." (*Id.*) Further, the process "was cumbersome" and "made it very difficult" for the Valuation Group, a small team, "to grow while maintaining high quality, timely deliverables at low cost for existing and new clients." (*Id.*)

On November 30, 2016, Hoemke drafted and shared with Munenzon a "Business Plan" which incorporated compensation amounts orally negotiated by Munenzon. (*Id.* at ¶20-21.) Those compensation amounts were as follows: $120,000 for 2017; $180,00 for 2018; $279,000 for 2019, and $411,773 for 2020. (*Id.* at ¶20.) Additionally, Munenzon negotiated a bonus of fifty-percent of his base salary for the years 2018 through 2020 and negotiated a pathway to partnership. (*Id.*) The Amended Complaint asserts that Economics and Munenzon came to an oral agreement regarding Munenzon's compensation "based upon the Business Plan." (*Id.* at ¶23.)

Once hired, Munenzon "designed from scratch a new, custom process to complete and prepare complex valuation reports for clients" and "built custom software tools to automate many key steps." (*Id.* at ¶24.) He also hired and trained an offshore team to execute his process. (*Id.*) The Amended Complaint asserts that Munenzon's custom process enabled him and his team "to prepare

over one hundred complex reports annually on a timely basis at low cost and with very high quality and accuracy." (*Id.* at ¶25.)

As alleged, "Hoemke's time significantly freed up" as a result of Munenzon's more efficient process. (*Id.* at ¶16.) However, rather than spending his newfound time growing Economics' business, Hoemke devoted his time to growing his other business, CrowdReason, LLC, which offers tax software. (*Id.* at ¶26-28.) The Amended Complaint alleges that over the last few years, CrowdReason's tax software business "has grown significantly faster" than Economics' valuation business. (*Id.* at ¶29.) Munenzon contends that "Hoemke left Economics Partners (and later Valentiam) to fend for itself, sometimes spending 50% or more of his time on CrowdReason." (*Id.* at ¶30.) At Munenzon's request, Hoemke promised to focus on the valuation business, but "ultimately ignored Munenzon's pleas." (*Id.*) Consequently, the "Valuation business development has suffered greatly." (*Id.*)

Regarding Munenzon's compensation, the Amended Complaint concedes that Economics, and later Valentiam, paid Munenzon his base salary as agreed in the Business Plan for the years 2017 and 2018. (*Id.* at ¶31.) However, in 2018, Valentiam delayed payment of Munenzon's bonus "until after it successfully coerced [him] into signing an employment agreement as a condition of receiving his earned and accrued 2018 bonus." (*Id.*) Munenzon refers to that agreement as the "Sham Agreement"; I will refer to it as the "2018 Agreement."[3] (*Id.* at ¶43.)

Additionally, in 2019, Valentiam paid Munenzon a base salary of $225,000, which was less than the $279,000 promised under the oral agreement. (*Id.* at ¶38.) According to Munenzon, Hoemke "disingenuously" cited Valentiam's and Munenzon's underperformance as the reason for refusing to pay Munenzon the previously agreed upon salary and bonus. (*Id.* at ¶39.)

---

[3]      Here, as in many cases, litigation counsel has seized on the definition of terms as an advocacy opportunity. I have adopted more neutral terminology, in keeping with the Court's obligation to credit factual allegations, but not legal conclusions, on a motion to dismiss.

However, "Valentiam's underperformance was largely due to Hoemke's neglect of the business development of the Company's Valuation Group." (*Id.* at ¶39.) Munenzon asserts that his own "tangible contribution to Valentiam's Valuation business remained critical and at a very high level." (*Id.* at ¶40.) Further, "the Valuation business grew despite Hoemke's lack of attention to it and it remained very profitable through the years of Munenzon's employment." (*Id.*) Additionally, Munenzon asserts that "project work had remained stable even during COVID-19." (*Id.* at ¶41.)

The Amended Complaint alleges that the 2018 Agreement did not contain any of the compensation terms of the prior oral agreement. (*Id.* at ¶44.) Instead, the agreement established a base salary of $225,000 without any mention of an annual bonus. (*Id.*)

Munenzon submits that Valentiam coerced him to sign the 2018 Agreement by holding hostage his earned and accrued bonus, to which he was already entitled. That tactic, he alleges, constitutes duress and invalidates the purported contract. (*Id.* at ¶45.) Munenzon alleges that he was made to "feel that he had no choice other than to sign the 2018 Agreement in order to receive the bonus he had already earned with his excellent performance throughout 2018." (*Id.*) Further, Hoemke presented the 2018 Agreement as a mere formality which was "somehow not a binding agreement. (*Id.* at ¶46.)

Munenzon signed the 2018 Agreement in the hope that he would still be paid under the terms of the prior oral agreement. (*Id.*) However, the Amended Complaint asserts that Hoemke "never intended" to honor the compensation terms of the oral agreement and, instead, merely used that agreement to lure Munenzon into working for Economics. (*Id.* at ¶47.)

Munenzon asserts that he "received very strong positive feedback" and that, "through all the years" he worked with Hoemke, Hoemke never gave Munenzon "a single negative written review." (*Id.* at ¶59.) Nevertheless, in March 2020, "Hoemke again reneged on promises by refusing to pay Munenzon his earned and accrued bonus for 2019 and refusing to increase his salary for

5

2020 to $411,773 as agreed." (*Id.* at ¶54.) This time, Hoemke cited the 2018 Agreement as well as Munenzon's purported underperformance as the basis for the allegedly reduced compensation. (*Id.*)

Recently (the Amended Complaint does not further specify the date), Hoemke announced that he had discovered a third party software vendor ("Vendor X") whose software system would replace a significant portion of Munenzon's system (*Id.* at 56.) Munenzon alleges, however, that Vendor X's software lacks "significant functionality" that Valentiam's client reports require and which they received through Munenzon's system. (*Id.* at ¶57.) The new software is also "very expensive" and requires manual entry of existing reports, which increases the time to complete and the chance of error. (*Id.* at ¶60.) Despite those deficiencies, "Hoemke was misrepresenting to clients that the new platform was without these grave shortcomings." (*Id.* at ¶62.) The Amended Complaint alleges that Hoemke's misrepresentations, and his failure "to make relevant disclosures to clients in connection with Vendor X's platform, could materially harm Valentiam clients by causing millions of dollars in fines, penalties and inaccurate tax assessments through errors and delays." (*Id.*)

Munenzon asserts that he brought the new platform's shortcomings to Hoemke's attention multiple times, both in writing and verbally. (*Id.* at ¶63.) He asserts that Hoemke's refusal to disclose the Vendor X platform's risk of delays and errors "was a flagrant abuse of clients' trust and constituted fraud against these clients" because "Valentiam reaped the benefits of higher billings to clients caused by the extra hours needed for Valentiam employees to migrate data and correct errors caused by the software." (*Id.* at ¶64.)

In the fall of 2018, Valentiam, Economics' alleged successor, was formed. (*Id.* at ¶31.) Munenzon alleges on information and belief that "(a) Valentiam expressly or impliedly assumed Economic Partners' Valuation Group's liabilities; (b) there was an actual or *de facto* consolidation or merger of Economics Partners' Valuation Group and Peters Advisors; and/or (c) Valentiam's Valuation Group is a mere continuation of Economics Partners'

Valuation Group." (*Id.* at ¶33.) Further, the Amended Complaint alleges upon information and belief that "(a) Hoemke continues to have an ownership interest in the Valentiam business; (b) the management of Economics Partners' and Valentiam's Valuation group is the same; (c) the structure and general business operations are the same; (d) the physical locations are largely the same; and (e) the customers are the same." (*Id.* at ¶34.)

As a result of that transaction, Munenzon became a Valentiam employee and continued to report directly to Hoemke. (*Id.* at ¶36.) Although he continued to work remotely from his home, Munenzon's "home base" with Valentiam was in Morristown, New Jersey. (*Id.*) Munenzon also worked with other Valentiam partners and employees who were based in the Morristown Office. (*Id.* at ¶37.)

On September 15, 2020, Munenzon complained to Hoemke and Valentiam that their conduct violated the NJWHL and CTWPL. (*Id.* at ¶65.) The Amended Complaint alleges that, within days, Valentiam retaliated against Munenzon for (1) asserting his concerns about the new software and the misrepresentations made to clients about that software and (2) complaining that Valentiam's compensation decisions violated the NJWHL and CTWPL. (*Id.* at ¶66.) Munenzon alleges that the Company first retaliated against him by placing him on a paid administrative leave and cutting his access to the Company's email without prior notice. (*Id.* at ¶67.) Second, Valentiam threatened Munenzon that when he returned, he would be placed on a Performance Improvement Plan ("PIP"). (*Id.* at ¶68.) Munenzon submits that, prior to placing him on administrative leave, neither Economics nor Valentiam "had issued a single negative written review" to him. (*Id.*) Therefore, "[t]he PIP would have been unwarranted and a sham." (*Id.*) However, on October 21, 2020, two days after Munenzon filed his initial Complaint and before Munenzon could return to work, Valentiam terminated his employment. (*Id.* at ¶69.) Therefore, the PIP never took effect. (*Id.*)

The Amended Complaint alleges that the Company terminated Munenzon's employment in retaliation for filing this action. (*Id.*) Valentiam

asserted that it fired Munenzon for cause as defined under the 2018 Agreement. (*Id.*) The Amended Complaint asserts, however, that because "the [2018] Agreement is invalid, a purported termination for Cause under the [2018] Agreement is invalid, and the attempt to characterize it as a Cause termination is another act of retaliation by Valentiam." (*Id.*) Further, Munenzon submits that "there was no factual basis for a termination for Cause." (*Id.*)

### b. Procedural History

Munenzon filed his initial Complaint (DE 1) on October 19, 2020, and his Amended Complaint (DE 8), the currently operative pleading, on November 10, 2020. The Amended Complaint asserts twelve causes of action:

**Count I** – Breach of Contract against Valentiam

**Count II** – Fraud in the Inducement against Hoemke

**Count III** – Unjust Enrichment against Valentiam

**Count IV** – Unjust Enrichment against Hoemke

**Count V** – Breach of Implied Contract against Valentiam

**Count VI** – Violation of the NJWHL against Valentiam

**Count VII** – Retaliation in violation of the NJWHL against Valentiam

**Count VIII** – Violation of the CTWPL against Valentiam

**Count IX** – Retaliation in violation of the CTWPL against Valentiam

**Count X** – Violation of CEPA against Valentiam

**Count XI** – Violation of CEPA against Hoemke

**Count XII** – In Quantum Meruit against Valentiam

(*Id.* at ¶¶70-125.) Munenzon seeks a declaratory judgment that the 2018 Agreement is void, damages, and fees. (*Id.* at ¶¶a-h.)

On December 21, 2020, Defendants filed a motion (DE 11) to dismiss certain of the claims pursuant to Federal Rule of Civil Procedure 12(b)(6). In particular, Defendants seek to dismiss the following claims:

**Count I** – Breach of contract claim against Valentiam

**Count II** – Fraudulent inducement claim against Hoemke

**Count VI** – NJWHL claim against Valentiam

**Count VII** – NJWHL retaliation claim against Valentiam

**Count X** – CEPA claim against Valentiam

**Count XI** – CEPA claim against Hoemke

(MTD Br. at 5-7.)

On January 5, 2021, Munenzon filed his opposition to Defendants' partial motion to dismiss, and also filed a Cross-Motion (DE 13) to Amend the Amended Complaint, pursuant to Federal Rule of Civil Procedure 15. Defendants filed their Reply on January 12, 2021, and, with leave of Court, Munenzon filed a Surreply on January 19, 2021.

## II.   Legal Standards

Rule 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Science Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the Munenzon. *New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014).

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a Munenzon's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) (Rule 8 "requires a 'showing' rather than a blanket assertion of an entitlement to relief." (citation omitted)). Thus, the complaint's factual allegations must be sufficient to raise a Munenzon's right to relief above a speculative level, so that a claim is "plausible on its face." *Twombly*, 550 U.S. at 570; *see also West Run Student Hous. Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 169 (3d Cir. 2013). That facial-plausibility standard is met "when the Munenzon pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Id.*

In this diversity case, the issue of whether the complaint states a claim is governed by state law. This Court's "role in diversity cases is to apply state law as announced by the state's highest court." *LaBarre v. Bristol-Myers Squibb Co.*, 544 F. App'x 120, 125 (3d Cir. 2013) (citing *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 253 (3d Cir. 2010) ("A federal court under *Erie* is bound to follow state law as announced by the highest state court." (internal citations omitted)). In the absence of a controlling decision highest court, district courts must predict how the court would decide the questions of law presented. *Wolfe v. Allstate Prop. & Cas. Ins. Co.*, 790 F.3d 487, 492 (3d Cir. 2015) (citing *Berrier v. Simplicity Mfg., Inc.*, 563 F.3d 38, 45-46 (3d Cir. 2009)); *Leonard v. Tractor Supply Co.*, 88 F. Supp. 3d 459, 461 (W.D. Pa. 2015). A federal district court in this position should consider "relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *Berrier*, 563 F.3d at 46 (quotation and citation omitted).

## III.   DISCUSSION

### a.   NJWHL Claims

First, Defendants seek to dismiss the NJWHL claims (**Counts VI** and **VII**) because New Jersey's wage and hour laws do not apply to non-New Jersey residents like Munenzon. (MTD Br. at 13-14.)

Counts VI and VII of the Amended Complaint assert violations of the NJWHL. (Am. Compl. ¶¶90-98.) In Count VI, the Amended Complaint alleges that Valentiam violated that law because "Valentiam did not pay Munenzon'[s] base salary and bonus as agreed" and, therefore, Munenzon "seeks wages related to work performed." (*Id.* at ¶91.) Count VII asserts a retaliation claim under the NJWHL. (*Id.* at ¶¶92-98.) In that regard, the Amended Complaint

alleges that (1) Munenzon complained to Hoemke that Valentiam violated the Act "with respect to his compensation"; (2) Valentiam retaliated against him by placing him on administrative leave, cutting off his access to the Company email without written notice, and threatening to place him on a PIP upon his return; and (4) Valentiam further retaliated against Munenzon by terminating his employment "for filing this action." (*Id.*) In opposition, Munenzon clarifies that Count VI and VII are brought pursuant to the New Jersey Wage Collection Law ("NJWCL"), N.J.S.A. 34:11-57 *et seq.*, which is "[w]ithin the NJWHL" and "protects an employee from being deprived of 'wages.'" (CM Br. at 22.)

Munenzon contends that, under a choice of law analysis, New Jersey's wage and hour laws should apply.[4] (CM Br. at 22-23). New Jersey has adopted "the most significant relationship" test set out in the Restatement (Second) of Conflict of Laws (the "Restatement"). *Grandalski v. Quest Diagnostics Inc.*, 767 F.3d 175, 180 (3d Cir. 2014) (citing *P.V. ex rel. T.V. v. Camp Jaycee,* 962 A.2d 453, 459–60 (N.J. 2008)). Under that test, "courts first inquire whether an actual conflict exists between the laws of the potentially relevant states." *Id.* If there is such a conflict, "courts must then determine, by reference to the Restatement, which state has the most significant relationship to the case and parties." *Id.* For a statutory tort claim such as this, courts look to Section 145 of the Restatement, which incorporates by reference Section 6. *Portillo v. Nat'l Freight, Inc.*, 323 F. Supp. 3d 646, 658 (D.N.J. 2018) ("Statutory wage claims have been construed as tort claims.").

Section 145 states:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

---

[4]     The Amended Complaint asserts claims under Connecticut's wage and hour law as well (Counts XIII and IX). Defendants have not moved to dismiss those Connecticut state law claims.

>> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>>
>> (a) the place where the injury occurred,
>>
>> (b) the place where the conduct causing the injury occurred,
>>
>> (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and
>>
>> (d) the place where the relationship, if any, between the parties is centered.
>>
>> These contacts are to be evaluated according to their relative importance with respect to the particular issue.
>
> Section 6 states that factors "relevant to the choice of the applicable rule of law include
>
>> (a) the needs of the interstate and international systems,
>>
>> (b) the relevant policies of the forum,
>>
>> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>>
>> (d) the protection of justified expectations,
>>
>> (e) the basic policies underlying the particular field of law,
>>
>> (f) certainty, predictability and uniformity of result, and
>>
>> (g) ease in the determination and application of the law to be applied.

*Id.* 658 (first quoting Restatement (Second) of Conflict of Laws § 145 (1988), then quoting § 6).

Munenzon fails to address the threshold question, *i.e.,* whether there is a conflict between New Jersey's and (presumably) Connecticut's wage and hour law. Rather, Munenzon submits that the NJWHL should apply because New Jersey has the most significant relationship to his claims. (CM Br. at 23-25.) He asserts that the facts supporting application of New Jersey law pursuant to Section 145 of the Restatement are as follows: (1) the conduct causing the alleged injury occurred in New Jersey, the location of Valentiam's principal place of business; (2) Valentiam was formed under the laws of New Jersey; and (3) the relationship of the parties is centered in New Jersey "because the

business for which Munenzon worked was located in New Jersey" and the 2018 Agreement contains a choice-of-law provision designating New Jersey law. (CM Br. at 24.) Munenzon further argues that he seeks to regulate conduct that occurred *within* New Jersey because Valentiam's alleged wrongs ((1) not paying Munenzon as agreed and (2) retaliating against Munenzon) were committed from its headquarters in the state. (*Id.* at 22.) In contrast, submits Munenzon, only two factors weigh against application of New Jersey law: (1) the place where the injury occurred was Connecticut, where he resides; and (2) Munenzon's domicile is Connecticut. (*Id.* at 24.) Munenzon contends that, on balance of the above contacts, New Jersey's interests prevail. (*Id.*)

Regarding the Section 6 factors, Munenzon submits that the choice-of-law provision in the 2018 Agreement supports application of subsections (b), (c), (d), (f), and (g), because "it would be difficult for anyone to suggest that the application of New Jersey law to the present non-contractual [wage and hour] disputes was beyond the parties' expectations." (*Id.* at 24-24 (internal quotations omitted) (alteration in original) (quoting *Portillo*, 323 F. Supp. 3d at 662)). Munenzon concedes that the underlying policies of the statutory wage claim do not constitute a strong factor in support of New Jersey law. (*Id.* at 25.)

Munenzon relies primarily on *Portillo*, where a court in this district found, pursuant to a choice-of-law analysis, that New Jersey law should apply to wage claims asserted by non-resident plaintiffs. 323 F. Supp. 3d at 648. There, the plaintiffs were truckers from Pennsylvania and Rhode Island who performed delivery services for the defendants, New Jersey corporations, throughout the east coast. *Id.* The plaintiffs alleged, *inter alia*, that the defendants misclassified them as independent contractors rather than employees and asserted that New Jersey law should govern the dispute. *Id.* The parties conceded that a conflict between the potentially applicable laws (New Jersey and Massachusetts) might exist. *Id.* at 652. The court subsequently concluded that New Jersey had the "most significant relationship" to the parties and the claims. *Id.* at 658-663.

The *Portillo* court so held because (1) the defendants were the more sophisticated party and elected to bound by New Jersey law regarding their contract claims; (2) "the nature of the [p]laintiffs' work was highly mobile and not based in any other state more significantly so as to grant that state the most significant interest"; (3) that the physical relationship between the parties appeared to be centered in a Pennsylvania warehouse was not dispositive; and (4) the plaintiffs "did perform a significant portion of their work in New Jersey." *Id.* at 663. Further, the court noted that while the plaintiffs' "state of residence have an interest in the proper payment of wages to their citizens, it appears to be without question that Plaintiff knowingly took on a business opportunity that was inherently of an interstate nature" and no plaintiff's "work was primarily performed in his own state of residence." *Id.* Thus, "[t]his [wa]s not the case where plaintiffs seek the protection of New Jersey state wage and employment laws for people who avowedly never worked in New Jersey." *Id.*

*Portillo* is easily distinguishable from the facts here. First, Munenzon alleges that he always worked remotely from his home in Connecticut even though his "home base" with Valentiam was in Morristown, New Jersey.[5] (Am. Compl. ¶¶13, 36.) Thus, unlike the plaintiffs in *Portillo*, Plaintiff Munenzon never did actually work *in* New Jersey, let alone perform a "significant portion" of his work in this State. *See* 323 F. Supp. 3d at 663; (Am. Compl. ¶¶13, 36). Further, it appears that most if not all of Munenzon's work occurred in his home, seemingly with no travel necessary. (*See* Am. Compl. ¶¶13, 36.) Therefore, unlike the plaintiffs in *Portillo*, Plaintiff Munenzon did not take "on a business opportunity that was inherently of an interstate nature." *See* 323 F. Supp. 3d at 663. Indeed, this case appears to be precisely what *Portillo* expressly was not, *i.e.*, one where the Munenzon seeks the protection of New Jersey state wage and employment law even though he "avowedly never worked in New Jersey." *See id.*

---

[5] I note in passing that Munenzon began working at home in 2017, long before the exigencies of the COVID-19 pandemic forced that alternative on many.

14

Defendants maintain that there is no "conflict" of laws as such; rather, *substantive New Jersey law provides* that out-of-state employees are not protected by the NJWHL or NJWCL. (Reply at 8-9.) In other words, even assuming that New Jersey law governs, that law itself provides that New Jersey's wage and hour laws do not apply extraterritorially. (*Id.*) Additionally, Defendants submit that a New Jersey choice-of-law provision in Munenzon's employment agreement (which he repudiates in any event), would not change the calculus, because courts in this district have consistently held that New Jersey wage and hour law does not apply extraterritorially. (*Id.*) Defendants have the better argument here.

The provisions of the NJWHL and the NJWCL cited by Munenzon do not discuss the statutes' extraterritorial reach. Indeed, N.J.S.A. 34:11-57 defines "employee" as "any natural person who works for another for hire," and "employer" as "any person, partnership, firm or corporation employing another for hire." Accordingly, neither party really stresses the plain language of the statutes, which are silent as to extraterritorial application.

I therefore turn to the case law interpreting those statutes. It is fairly uniform in suggesting or holding that New Jersey's wage and hour law does not apply to out-of-state workers.

In *Lupian v. Joseph Cory Holdings, LLC*, a court in this district declined to apply the NJWHL and NJWPL to workers from Illinois who claimed "violations of wage laws in connection to conduct occurring within Illinois." 240 F. Supp. 3d 309, 313-14 (D.N.J. 2017). The court based its holding on the "public policy interest against extraterritorial application" of those statutes. *Id.* There, the defendant was a New Jersey motor carrier corporation that provided delivery services throughout the United States. *Id.* at 311. The plaintiffs were Illinois residents who performed delivery services for the defendant. *Id.* The applicable employment agreements contained forum selection and choice-of-law clauses providing that all disputes should be adjudicated in the State of New Jersey, under New Jersey law. *Id.* The plaintiffs argued, *inter alia*, that the

defendant had misclassified them as independent contractors instead of employees, and sought relief under the NJWPL. *Id.* at 312-13. The plaintiffs (like Munenzon here) also sought relief under the law of their home state, specifically, the Illinois Wage Payment and Collection Act. *Id.* at 312.

*Lupian* concluded that the Illinois wage and hour law applied to the pending dispute. *Id.* at 314. In so holding, the court noted that New Jersey courts will generally uphold a choice-of-law provision if it does not violate the state's public policy. *Id.*at 313. Although the Court found that New Jersey had a "substantial relationship" to the parties because the defendant was its citizen, the Court concluded that extraterritorial application of the NJWPL and NJWHL to Illinois employees would violate state policy. *Id.* The court reasoned that "it is well settled that 'New Jersey law does not regulate conduct outside the state'" and that "[t]he few courts that have considered the issue have all held 'that the NJWPL *does not* apply to employees based outside of New Jersey.'" *Id.* at 313-14 (first quoting *D'Agostino v. Johnson & Johnson, Inc.*, 628 A.2d 305, 318 (N.J. 1993), then quoting *Overton v. Sanofi–Aventis U.S., LLC*, No. 13-5535, 2014 WL 5410653, at *5-6 (D.N.J. Oct. 23, 2014)).[6]

Other courts in this district have held similarly. In *Ortiz v. Goya Foods*, the court declined to apply the NJWPL in a dispute involving claims of individuals who worked outside of New Jersey, "regardless of the breadth of [the] contractual choice of law provision." No. 19-19003, 2020 WL 1650577, at *4 (D.N.J. Apr. 3, 2020). There, the plaintiff, Ortiz, was a resident of Pennsylvania and worked as a sales representative for Goya, an employer headquartered in New Jersey. *Id.* at *1. At all relevant times, Ortiz performed his sales work in Pennsylvania, though he was required to "attend periodic

---

[6]      On an interlocutory appeal of an unrelated holding in *Lupian*, the United States Court of Appeals for the Third Circuit noted with approval the district court's refusal to apply the NJWPL extraterritorially, but without discussing the issue in any depth. *Lupian v. Joseph Cory Holdings LLC*, 905 F.3d 127, 130 n.1 (3d Cir. 2018) ("On appeal, the parties do not disagree that Illinois law should be applied, nor do we.").

meetings" in New Jersey. *Id.* at *3. He argued that New Jersey's wage and hour law applied based on the choice-of-law provision in his employment contract. *Id.* The defendant submitted that the NJWPL "has no extraterritorial application" and, therefore, could not provide the relief the plaintiff sought. *Id.*

The *Ortiz* court agreed with the defendant and held that Ortiz failed to state a claim for relief under the NJWPL. *Id.* It found (as do I) that "the New Jersey Supreme Court has not published a decision definitively resolving whether the NJWPL affords relief to out-of-state employees of New Jersey-based companies." *Id.* It therefore reviewed decisions of New Jersey's lower courts and District Courts within this Circuit. From that review, *Ortiz* concluded "that New Jersey has little to no interest in providing employment protections, including the NJWPL, to individuals outside of New Jersey," and "has a well-established public policy against governing out-of-state conduct." *Id.* at *3-4 (citing *Winslow v Corporate Express, Inc.*, 834 A.2d 1037, 1041 n.2 (N.J. Supp. Ct. App. Div. 2003) (noting that because the "plaintiff's office was located in Delaware, there may be a question whether [NJWPL] governed his employment" but declining to decide the issue because it had not been briefed); *Mulford v. Computer Leasing, Inc.*, 759 A.2d 887, 891 (N.J. Supp. Ct. Law Div. 1999) (finding New Jersey wage and hour law applicable to dispute between an individual who lived and worked in New Jersey for a New York corporation); *Lupian*, 240 F. Supp. at 313-14 (discussed *supra*); *Reddick v. E Mortgage Mgmt, LLC*, No. 11-1260, 2013 WL 1087910, at *10-12 (D. Del. Mar. 15, 2013) (addressing whether New Jersey wage law "applies to wage claims made by employees of New Jersey companies . . . who work outside of New Jersey (i.e., in an out-of-state branch office)" and concluding that "the Law is only applicable to those working within New Jersey's geographical boundaries.").

Similarly, in *Overton v. Sanofi-Aventis U.S., LLC*, the court held that the NJWPL was inapplicable to that out-of-state employee's claims. No. 13-5535, 2014 WL 5410653, at *6 (D.N.J. Oct. 23, 2014). In *Overton*, the defendant was a Delaware limited liability corporation with its headquarters and principal

place of business in New Jersey. *Id.* at *1. The plaintiffs were residents of Virginia, Louisiana, and Wisconsin who worked in the defendant's sales territories for those states. *Id.* They asserted claims under, *inter alia*, the NJWPL. That New Jersey statute applied to them, they asserted, because "they were supervised from New Jersey, they were issued credentials as New Jersey employees, and the address listed on their business cards was the address of the [defendant's] Bridgewater, New Jersey office." *Id.* at *5.

The *Overton* court noted that every court to have addressed the issue had held that the NJWPL does not apply extraterritorially to out-of-state employees of New Jersey employers. *Id.* Further, the court reasoned that "[t]he states where the[] plaintiffs lived and worked would have the greatest interest in their treatment as employees." *Id.* Therefore, the court found New Jersey's wage and hour law inapplicable to the employee's claims. *Id.*

I find the decisions relied upon by Defendants to be persuasive. The New Jersey Supreme Court has not rendered a decision on the issue. One lower court, considering the obverse of our issue, relied on the principle that this state's wage and hour law as applies to employees working in New Jersey. *See Mulford*, 334 758 A.2d at 891 (applying the NJWHL to an employee working in New Jersey for a New York corporation, suggesting that it is the location of the employee and not the employer that governs); *see also Echavarra, et al. v. Williams Sonoma, Inc. et al.*, No. 15-6441, 2016 WL 1047225, at *9 (D.N.J. Mar. 16, 2016) (citing *Mulford* for the proposition that "New Jersey law does not apply beyond its borders."). That state court case law is surely somewhat sparse. Nevertheless, as explained above, the federal district courts have repeatedly held that the New Jersey wage and hour law does not apply to non-New Jersey employees of New Jersey employers. *See Lupian, supra*; *Ortiz, supra; Overton, supra.*

Working remotely for a New Jersey company is concededly different from working for, say, a branch office of a New Jersey company. Such a stay-at-home employee is directly linked to the New Jersey employer, and is not

18

"anchored" in the same manner to a local brick-and-mortar office of the employer. However, it appears from the Amended Complaint that Munenzon's place of employment was intended from the start to be his home in Connecticut. This permanent remote employment, clearly contemplated and agreed to by the parties from the outset, differs from an arrangement that is temporary or incidental.[7] Based on the case law described above, I find that, in such a scenario, New Jersey's wage and hour laws do not extend to Plaintiff Munenzon, who concededly worked from his home in Connecticut throughout the duration of his employment. Therefore, I find that the Amended Complaint fails to state a claim under the NJWHL or NJWCL and will grant Defendants' motion to dismiss those claims.

### b. CEPA Claims

Defendants next move to dismiss **Counts X** and **XI** of the Amended Complaint, which assert CEPA claims against Valentiam and Hoemke based on Munenzon's alleged whistleblowing concerning their alleged fraudulent concealment of flaws in the Vendor X software. (Am. Compl. ¶¶108-120; CM Br. at 27.)

Munenzon alleges that, on "multiple occasions" he "cautioned Hoemke about the misrepresentations Hoemke was making to clients, as well as Hoemke's failure to make relevant disclosures to clients in connection with the software." (*Id.* at ¶¶109, 115.) Further, Munenzon alleges that he was retaliated against "for making these warnings" because Valentiam (1) placed him on administrative leave; (2) cut off Munenzon's access to the Company's email; (3) threatened to place Munenzon on a PIP; and (4) terminated Munenzon's employment upon filing this lawsuit. (*Id.* at ¶¶108-120.) Munenzon further alleges that he reasonably believed Valentiam's misrepresentations in

---

[7]   A work-at-home arrangement, bargained for and mutually agreed upon, presumably reflects a convenience and cost saving to the employer and/or employee. I therefore do not reach the potentially more difficult issue of the status of an employee who ordinarily worked at a New Jersey office but was forced to work remotely for the duration of a global pandemic, through no fault or desire of the employer.

connection with the Vendor X software were "serving to defraud Valentiam's clients." (*Id.* at ¶¶109, 115.)

CEPA was enacted to "protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." *Abbamont v. Piscataway Twp. Bd. of Educ*, 650 A.2d 958, 971 (1994). To effectuate that aim, the statute provides, in relevant part, as follows:

> An employer shall not take any retaliatory action against an employee because the employee . . . [d]iscloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer . . . that the employee reasonably believes . . . is in violation of a law.

N.J.S.A. 34:19-3(a)(1).

To establish a cause of action for retaliation under CEPA, an employee must demonstrate four elements: (1) he[8] had a reasonable belief that his employer's conduct violated a law, regulation, or clear mandate of public policy; (2) he performed a "whistle-blowing" activity under the act; (3) the employer took an adverse employment action against him; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action. *Dzwonar v. McDevitt*, 828 A.2d 893, 900 (2003); *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 404 (3d Cir. 2007).

The Amended Complaint does not identify a law, regulation, or clear mandate of public policy that (Munenzon reasonably believed) Defendants violated. (*See* Am. Compl. ¶¶108-120.) However, in his opposition brief, Munenzon states that his CEPA claims are focused on the statute's "fraud" subsections, N.J.S.A. 34:19-3(a)(2) and (c)(2). (CM Br. at 25.) Those subsections provide as follows:

> An employer shall not take any retaliatory action against an employee because the employee does any of the following:

_____

[8]     The plaintiff in this case happens to be male. Thus, for convenience, I do not alter quotations of outdated references to a generic employee using male pronouns.

> a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or another employer, with whom there is a business relationship, that the employee reasonably believes:
> . . .
>
> (2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity;
>
> . . . or
> c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
> . . .
>
> (2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity.

N.J.S.A. 34:19-3(a)(2) and (c)(2).

To plead a CEPA claim predicated on fraud, however, a plaintiff must meet the particularity requirements of Federal Rule of Civil Procedure 9(b). *Safonof v. DirectSat USA*, No. 19-07523, 2020 WL 1527946, at \*4 (D.N.J. Mar. 31, 2020) (applying Rule 9(b) to fraud-based CEPA claim); *see also Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (applying Rule 9(b) standard to claim for fraud under New Jersey law).  Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.*

Thus, under Rule 9(b), a plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the "precise misconduct with which [it is] charged." *Lum*

*v. Bank of America*, 361 F.3d 217, 223-24 (3d Cir. 2004); *see U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) ("A plaintiff alleging fraud must therefore support its allegations 'with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue.'" (quoting *In re Rockefeller Ctr. Props., Inc. Securities Litig.*, 311 F.3d 198, 217 (3d Cir. 2002))). Where a plaintiff is unable to recite "every material detail of the fraud such as date, location and time, plaintiffs must use 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *In re Rockefeller Ctr. Props. Secs. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002) (quoting *In re Nice Sys.*, 135 F. Supp. 2d 551, 557 (D.N.J. 2001)).

Here, the Amended Complaint alleges only that "plaintiff cautioned Hoemke about the misrepresentations Hoemke was making to clients, as well as Hoemke's failure to make relevant disclosures to clients" in connection with the Vendor X software. (Am. Compl ¶¶109, 115.) That vague allegation does not meet the particularity requirement of Rule 9(b). Indeed, "it provides neither the particular date, time, and place of the alleged fraud, nor the substance of the misrepresentation." *See Safonof*, 2020 WL 1527946 at *4 (dismissing fraud-based CEPA claim because, *inter alia*, the allegation that the employer engaged in certain actions "in an attempt to defraud" did not satisfy Rule 9(b)'s pleading requirements). Nor does the Amended Complaint provide alternative means to substantiate the allegations of fraud. *See In re Rockefeller* 311 F.3d at 216.

Munenzon does not deny that his CEPA claim fails to satisfy Rule 9(b). (*See generally* Surreply.) Instead, he submits that the particularity requirement should not apply to his CEPA claim because he "is not alleging a direct fraud case against Defendants by his CEPA claim; instead, for the Plaintiff herein, fraud is the 'activity, policy or practice of deception or misrepresentation which [Munenzon] reasonably believe[d] may defraud any . . . client [or] customer . . .' and is the basis of his CEPA claim." (*Id.* at 5 (second, third, and fourth alteration in original) (quoting N.J.S.A. 34:19-3c(2)).) Munenzon objects that "if

in a [CEPA] case the employer's conduct does not technically constitute fraud, the Plaintiff could well be hard-pressed to plead the "fraud" with particularity." (*Id.*) In other words, he seems to be saying that because the CEPA plaintiff need only have "reasonably believed" the conduct was fraudulent, Rule 9(b) should not apply in the same manner that it applies to a direct claim of fraud. (*Id.*)

I disagree. Whether or not the employer's actions turned out to meet the legal definition of fraud, a plaintiff may and must still describe the particular *facts* he *reasonably believed* constituted fraud. And under Rule 9(b)'s pleading standard, such facts must be alleged with particularity.

Munenzon next argues that Rule 9(b) should not apply because it would "conflict with the axiom that CEPA be liberally construed in order to effectuate its Legislative purpose." (*Id.* at 5-6 (citing *Dzwonar*, 828 A.2d at 901). However, the New Jersey Consumer Fraud Act ("NJCFA") is also liberally construed to effectuate its remedial purpose, *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 461 (1994), and the United States Court of Appeals for the Third Circuit has applied Rule 9(b) to NJCFA claims, *Frederico*, 507 F.3d at 203-03; *F.D.I.C. v. Bathgate*, 27 F.3d 850, 876 (3d Cir.1994).

Because Munenzon failed to plead the fraud-based CEPA claims with the requisite specificity, I will dismiss Counts X and XII of the Amended Complaint. I grant Defendants' dismissal without prejudice, however, as amendment "could potentially cure the deficiencies mentioned above." *See Safonof*, 2020 WL 1527946 at *5.

### c.  Fraud in the Inducement Claim

Defendants next submit that the **Count II** fraud in the inducement claim should be dismissed for failure to plead all the necessary elements. (MTD Br. at 18-20.) Additionally, Defendants argue that the claim must fail because the Amended Complaint does not satisfy the heightened pleading requirements under Rule 9(b). (Reply at 12.)

Count II alleges that "Hoemke made material, intentional misrepresentations to Munenzon, including but not limited to promises relating

23

to (a) Munenzon's compensation and (b) that Hoemke would focus his business development efforts on Economics Partners." (Am. Compl. ¶77.) It further alleges that "Hoemke intentionally reneged" on those promises and intended for Munenzon to rely on them "to persuade Munenzon to accept employment and enter into the Oral Agreement with Economics Partners." (*Id.* at ¶¶77-78.)

The five elements of fraud in the inducement track those of common law fraud: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Microbilt Corp. v. L2C, Inc.*, No. L-1118-09, 2011 WL 3667645, at *3 (N.J. Sup. Ct. App. Div. Aug. 23, 2011) (citing *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 367 (1997)); *see also RNC Sys., Inc. v. Mod. Tech. Grp., Inc.*, 861 F. Supp. 2d 436, 451 (D.N.J. 2012) (reciting the elements).

Fraud in the inducement is a far narrower theory than breach of contract; it does not cover an ordinary breach of promise about future events. The first element of a fraud claim is that a party has made a "material representation of a presently existing or past fact." *CPS MedManagement LLC v. Bergen Reg'l Med. Ctr., L.P.*, 940 F. Supp. 2d 141, 158 (D.N.J. 2014). Misrepresentations of present or past fact constitute a fairly narrow category, and must be construed so as to maintain the border between actions in tort and contract. For example, statements about future profitability have repeatedly been held to fall outside of the category of actionable fraud:

> Statements as to future or contingent events, to expectations or probabilities, or as to what will or will not be done in the future, do not constitute misrepresentations, even though they may turn out to be wrong. *Chatlos Systems, Inc. v. National Cash Register Corp.*, 479 F.Supp. 738, 749–49 (D.N.J.1979); *aff'd in part, rev'd in part*, 635 F.2d 1081 (3d Cir.1980). Similarly, statements that can be categorized as "puffery" or "vague and ill-defined opinions" are not assurances of fact and thus do not constitute misrepresentations. *Diaz v. Johnson Matthey, Inc.*, 869 F.Supp. 1155, 1165 (D.N.J.1994); *see also VT Investors v. R & D Funding Corp.*, 733 F.Supp. 823, 838 (D.N.J.1990) (statements that company in which

24

plaintiffs invested would soon generate positive cash flow in excess of $60,000 per month characterized by court as non-actionable "puffery" because it was an emphatic statement of opinion*); see also Schott Motorcycle Supply, Inc. v. American Honda Motor Co., Inc.*, 976 F.2d 58, 63–64 (1st Cir.1992) (court held that representations concerning a commitment to the motorcycle market and the future profitability of Munenzon's franchise were merely opinions of future events and could not be justifiably relied upon as "facts"); *Vaughn v. General Foods Corp.*, 797 F.2d 1403, 1411 (7th Cir.1986) (court rejected a franchisee's efforts to sustain a claim for fraudulent non-disclosure against its franchisor, based on the latter keeping confidential its intention to divest its unprofitable Burger Chef operations, while representing that it intended to build operation into a fast food contender). Indeed, in order to constitute a fact, a statement's content must be susceptible of "exact knowledge" at the time it is made. *Id.*; *see also Notch View Assoc., A.D.S. v. Smith*, 260 N.J.Super. 190, 202–03, 615 A.2d 676 (Law Div.1992) (statement as to future event has been held to constitute actionable misrepresentation when "the defendant [has] ... no intention at the time he makes the statement of fulfilling the promise.")

*Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 435 (D.N.J.), *aff'd*, 172 F.3d 859 (3d Cir. 1998).

Munenzon submits that Count II should proceed because "Hoemke lured Munenzon into employment by making false promises relating to Munenzon's compensation." (CM Br. at 30.) However, as alleged in the Amended Complaint, Munenzon and Economics entered into an oral *agreement* about Munenzon's *future* compensation. (*See* Am. Compl. ¶20.) Specifically, the Amended Complaint asserts:

In exchange for an extremely low starting base salary of $120,000.00 for 2017 –for a person of his pedigree and expertise – Munenzon negotiated for an increase in base salary of $180,000, $279,000 and $411,773, in 2018, 2019 and 2020, respectively. Munenzon also negotiated for a bonus of 50% of his base salary for each of 2018, 2019 and 2020. Munenzon further negotiated for a path to partnership at Economics Partners. Hoemke clearly saw the tremendous value Munenzon brought, when Hoemke wrote to Munenzon: "I am truly excited to work and grow the firm with you." Moreover, this statement is consistent with the promised path to partnership.

25

(*Id.*) Those compensation amounts were orally agreed to based upon a "Business Plan" drafted by Hoemke. (*Id.* at ¶21.)

To promise a certain salary and later fail to pay it may constitute a breach of contract. As explained, however, statements "as to what will or will not be done in the future" are not "material representations" for purposes of establishing fraud. *See Alexander*, 991 F. Supp. at 435. Moreover, the Amended Complaint alleges that in "2017 and 2018, Economics Partners and Valentiam *paid Munenzon as agreed* in the Business Plan, including the 50% bonus." (Am. Compl. ¶31 (emphasis added).) Thus, even fully crediting the allegations of the Amended Complaint, Defendants fulfilled their purported promise for at least two years. *See Alexander*, 991 F. Supp. at 435 (citing *Notch View Assoc.*, 615 A.2d at 682). Munenzon has failed to state a claim for fraud in the inducement with respect to Defendants' promises of future compensation.

Munenzon also submits that Hoemke committed fraud in the inducement by falsely representing that he "would focus his business development efforts on Economics Partners." (Am. Compl. ¶77.) Munenzon contends that "[i]f Hoemke had not reneged on this promise, Munenzon's compensation would have increased along with the growth of the business" and that "Hoemke knew he did not intend to spend time developing business for Valentiam, as evidenced by Hoemke's spending time on another business venture." (CM Br. at 30.)

Virtually any breach of contract can be cast as a claim that a party secretly never intended to honor it. Likewise, any contracting party may easily allege that it never would have entered into the contract if it had known the other party was going to breach. But "vague and ill-defined" statements about future events, such as generally promising to grow a business, do not constitute material representations. *See Alexander*, 991 F. Supp. at 436 ("predictions of the future, which were believed when made, cannot serve as a basis for a fraud claim just because they subsequently turn out not to be

26

true."); *CDK Global, LLC v. Tulley Auto. Grp., Inc.* 489 F. Supp. 3d 282, 305 (D.N.J. 2020), *reconsideration denied*, No. 15-3103, 2021 WL 1187123 (D.N.J. Mar. 30, 2021) (finding statements that a certain system would save the defendant "time and money," would make the defendant's company "more profitable" and "would reduce complexity" were "generalities about the future, and thus cannot be the basis of a fraudulent inducement claim.").

Therefore, Munenzon's allegations that Hoemke reneged on representations that he would grow the business of Economics and, later, Valentiam, do not support a claim of fraud in the inducement. I will grant Defendants' motion to dismiss Count II of the Amended Complaint.[9]

### d. Breach of Contract Claim

Finally, Defendants submit that the **Count I** breach of contract claim fails as a matter of law. (MTD Br. at 20.) Defendants contend that Munenzon (1) failed to plead facts supporting his claim that Valentiam is a successor-in-interest to Economics and (2) failed to plead sufficient facts to sustain a breach of contract claim. (*Id.* at 21-24.) Because I agree that Munenzon failed to plead a claim for successor liability, I will grant Defendants' motion to dismiss Count I.

The Amended Complaint alleges that Defendants breached the oral agreement between Munenzon and Economics regarding Munenzon's compensation. (Am. Compl. ¶¶70-75.) Further, the Amended Complaint asserts that Valentiam replaced Economics "as a party to the Oral Agreement" when Peters Advisors merged with Economics to form Valentiam. (*Id.* at ¶74.)

---

[9]        Because Count II is not adequately pled, I do not reach the issue of whether Defendants' attachments, such as the alleged Business Plan and email exchanges between Munenzon and Hoemke regarding Munenzon's compensation, would be properly considered in further support of their motion to dismiss. *See In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999) (quoting *PBGC v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir.1993) ("[A] district court may examine an 'undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.'").

Generally, a purchasing company "is not liable for the debts and liabilities of the selling company simply because it has succeeded to the ownership of the assets of the seller." *Lefever v. K.P. Hovnanian Enterprises, Inc.*, 734 A.2d 290, 292 (N.J. 1999). However, successor liability may exist where "(1) the successor expressly or impliedly assumes the predecessor's liabilities; (2) there is an actual or *de facto* consolidation or merger of the seller and the purchaser; (3) the purchasing company is a mere continuation of the seller; or (4) the transaction is entered into fraudulently to escape liability." *Id.* (citing 15 William & Fletcher, Cyclopedia of the Law of Corporations § 7122, nn. 9–15 (1990)). Because the second and third exceptions requires "much of the same evidence," they "are often treated in unison." *Woodrick v. Jack J. Burke Real Est.*, Inc., 703 A.2d 306, 312 (N.J. Sup. Ct. App. Div. 1997)

> In determining whether a particular transaction amounts to a *de facto* consolidation or mere continuation, most courts consider four factors: (i) continuity of management, personnel, physical location, assets, and general business operations; (ii) a cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible; (iii) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; and (iv) continuity of ownership/shareholders.

*Id.* (collecting cases). Not all of those factors must be present for a *de facto* merger or continuation to be found. *Id.* Instead, "[t]he crucial inquiry is whether there was an 'intent on the part of the contracting parties to effectuate a merger or consolidation rather than a sale of assets.'" *Id.* (alteration in original) (quoting *Luxliner P.L. Export, Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69, 73 (3d Cir.1993)).

Defendants are correct that the Amended Complaint "simply parrots the above standards in an effort to plead successor liability." (MTD Br. at 21.) Indeed, regarding the alleged merger, the Amended Complaint alleges as follows:

> When Peters Advisors merged with Economics Partners to form Valentiam, upon information and belief: (a) Valentiam expressly or

28

impliedly assumed Economics Partners' liabilities; (b) there was an actual or *de facto* consolidation or merger of Economics Partners' Valuation Group and Valentiam; and/or (c) Valentiam's Valuation Group is a mere continuation of Economics Partners' Valuation Group.

Upon information and belief: (a) Hoemke continues to have an ownership interest in the business (Valentiam); (b) the management of Economics Partners' and Valentiam's Valuation Groups is the same; (c) the structure and general business operations are the same; (d) the physical locations are largely the same; and (e) the customers are the same.

(*Id.* at ¶¶72-73.) Inserting the parties' names into the elements of a claim is not sufficient. *See*, *e.g.*, *Bell Atl. Corp.*, 550 U.S. at 555; *See Phillips*, 515 F.3d at 232.

Munenzon submits that he "was not privy to the details of the transaction" between Peters Advisors and Economics and that such details "will have to be gleaned during discovery." (CM Br. at 33.) However, Munenzon concedes that if his pleading is insufficient, he "is able to offer more information to flesh out the[] allegations." (*Id.*) For example, "Munenzon can identify managers, clients and locations" and "can describe how the general business operations of the two Valuation Groups are largely the same." (*Id.*) It is unclear why those allegations are missing from the Amended Complaint. Without them, however, Munenzon fails to plead successor liability. *See Ashcroft*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). Therefore, Defendants' motion to dismiss Count I will be granted.

Munenzon's additional statements suggest, however, that amendment would not be futile, and he seeks to amend the complaint in any event. The Court, moreover, will grant some leeway, in that the facts about these internal corporate arrangements are largely in the control of the Defendants.[10]

---

[10]   Defendants also submit that the Amended Complaint fails to allege that Economics actually sold its assets to Valentiam. (MTD Br. at 22.) According to

## IV.     Munenzon's Cross-Motion to Amend

Munenzon requests leave to file a second amended complaint under Rule 15 to replead his claims under Counts I, II, V, VI, VII, X and XI. (CM Br. at 36.) I will grant Munenzon's cross-motion to amend with respect to his fraud in the inducement claim (**Count II**), CEPA claims (**Count X and XII**), and breach of contract claim (**Count I**). However, I will deny the cross-motion with respect to Munenzon's claims under the NJWHL, because I have found that statute does not apply as a matter of law. (**Counts X and XII**).

> A party may amend its pleading once as a matter of course within:
>
> (A) 21 days after serving it, or
>
> (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under 12(b), (c), or (f), whichever is earlier.

Fed. R. Civ. P. 15(a); *see also  Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000). Otherwise, "a party may amend its pleading only with the opposing party's written consent or the court's leave." FED. R. CIV. P. 15(a)(2). "[L]eave [to amend] shall be freely given when justice so requires." *Id.* Accordingly, the courts "have shown a strong liberality ... in allowing amendments under Rule 15(a)." *Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing*, 663 F.2d 419, 425 (3d Cir.1981) (quoting 3 J. Moore, Moore's Federal Practice ¶ 15.08(2) (2d ed. 1989)).

---

Defendants, Economics was actually "acquired by an independent company, Ryan. (*Id.* (citing Exhibit D (DE 11-7) to the Certification of Thomas J. Rattay, Esq. ("Rattay Cert.") (DE 11-3).) According to Defendants, "Hoemke subsequently joined Valentiam as a partner and he offered Munenzon a job at this separate company." (*Id.*) Thus, Defendants deny that there was any merger of Economics and Peters Advisors. (*Id.*) Defendants submit that the Court may take judicial notice of the Articles of Organization for Economics and the Certificate of Formation for "Peters Advisors/ Valentiam." (*Id.* (citing Exhibits D and E to the Rattay Cert.) Munenzon clarifies that he "alleges that Peters Advisors merged with Economics Partners' Valuation Group to form Valentiam – not that Economics and Valentiam merged." (CM Br. at 34.) Because I have found that the Amended Complaint failed to sufficiently plead successor liability on its face, I will not consider Defendants' fact evidence at this juncture.

In determining a motion for leave to amend, Courts consider the following factors: (1) undue delay on the part of the party seeking to amend; (2) bad faith or dilatory motive behind the amendment; (3) repeated failure to cure deficiencies through multiple prior amendments; (4) undue prejudice on the opposing party; and/or (5) futility of the amendment. *Foman v. Davis*, 371 U.S. 178 (1962); *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 174 (3d Cir. 2010).

"Futility" means that the complaint, as amended, "would not withstand a motion to dismiss." *Massarsky v. Gen. Motors Corp.*, 706 F.2d 111, 125 (3d Cir. 1983); *see also Brown v. Philip Morris Inc.*, 250 F.3d 789, 796 (3d Cir. 2001); *Adams v. Gould Inc.*, 739 F.2d 858, 864 (3d Cir. 1984). Otherwise, "prejudice to the non-moving party is the touchstone for the denial of an amendment." *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir. 1993) (internal quotation and citation omitted). Thus "delay," for example, entails more than the mere passage of time; to warrant denial of leave to amend, it must be "undue" or prejudicial. *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001). The Court should deny leave only when the *Foman* factors "suggest that amendment would be 'unjust'. . . ." *Arthur v. Maersk, Inc.*, 434 F.3d 196, 203 (3d Cir. 2006).

First, I find there is no undue delay in Munenzon's request to file a second amended complaint because Munenzon only initiated this action on October 19, 2020, and filed the (First) Amended Complaint shortly thereafter, on November 10, 2020. Munenzon filed this cross-motion to file a second amended complaint in response to Defendants' motion to dismiss, a common and understandable occurrence. Second, there is no evidence of bad faith or dilatory motive on part of Munenzon, and Defendant makes no such claim. (*See* Reply.) The single and prompt prior amendment does not bespeak repeated failures to cure, and there is no suggestion of undue prejudice to the Defendants if the motion is granted.

31

As for futility, I have already concluded that Munenzon may replead his fraud in the inducement claim (**Count II**) and his CEPA claims (**Counts X and XI**) to comport with the requirements of Rule 9(b). The defect is one of pleading, and if that Rule 9(b) standard can be met, amendment of those claims will not be futile. As for the remaining breach of contract claim (**Count I**), Munenzon could cure the deficiencies in the Amended Complaint by providing factual allegations regarding the alleged merger or continuation. Therefore, I will allow amendment as to that claim.[11] Regarding the **Count VI** and **VII** NJWHL claims, however, I find that any amendment would be futile because, as explained *supra*, New Jersey wage and hour law does not apply to this out-of-state plaintiff as a matter of law. Therefore, I will deny Munenzon's cross-motion to amend with respect to those two claims.

## V. Conclusion

For the reasons set forth above, I will grant Defendants' motion (DE 11) to dismiss in its entirety and will grant Munenzon's cross-motion (DE 13) to file a second amended complaint with respect to **Counts I, II, X** and **XI**. The

---

[11] Defendants also submit that the Amended Complaint fails to establish any breach of contract because Munenzon failed to sufficiently plead economic duress. (MTD Br. at 23; Reply at 17.)

The Amended Complaint alleges that Valentiam breached the terms of the oral agreement by failing to pay Munenzon the allegedly agreed upon compensation amounts. (Am. Compl. ¶74.) Munenzon alleges that the oral agreement, as opposed to the 2018 Agreement, controls because "Valentiam refused to pay Munenzon's earned and accrued bonus for 2018 unless Munenzon signed an economic agreement with Valentiam." (CM Br. at 34-35; Am. Compl. ¶¶43-46.) Munenzon submits that threatening to withhold Munenzon's bonus until he signed the 2018 Agreement constitutes economic duress which renders the agreement a nullity. (CM Br. at 34-35.) The theory goes that because the 2018 Agreement is void, the oral agreement controls. (*Id.*) And, because Valentiam failed to pay Munenzon in accordance with the compensation terms orally agreed upon, Valentiam breached that oral agreement. Defendants, however, submit that "Munenzon does not cite to any cases to support the proposition that the withholding of an accrued bonus constitutes economic duress." (Reply at 17.) The duress issue must be addressed in connection with any amendment.

dismissal of the NJWHL claims under **Counts VI** and **VII** are dismissed with prejudice.

An appropriate order follows.

Dated: August 11, 2021

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**