UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MIKHAIL MUNENZON,<br><br>    Plaintiff,<br><br>v.<br><br>PETERS ADVISORS, LLC D/B/A/ VALENTIAM GROUP LLC, AND CARL HOEMKE,<br><br>    Defendants. | Civ. No. 20-14644 (KM)(JBC)<br><br>OPINION |

### KEVIN MCNULTY, U.S.D.J.:

  Plaintiff Mikhail Munenzon sues his former employer, Peters Advisors, LLC ("Peters Advisors") d/b/a Valentiam Group, LLC ("Valentiam"), and Carl Hoemke, a partner at Valentiam to whom Munenzon directly reported. Munenzon asserts state-law claims for breach of contract; unjust enrichment; breach of implied contract; quantum meruit; violation of the Connecticut Wage Payment Laws, Conn. Gen. Stat. §§ 31-58, *et seq.* (the "CTWPL"); retaliation in violation of the CTWPL; and retaliation in violation of the New Jersey Conscientious Employee Protection Act, N.J. Stat. Ann. §§ 34:19-1, *et seq.* ("CEPA").

  Now before the Court is Defendants' motion to dismiss Munenzon's Second Amended Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). What Defendants have submitted, however, is tantamount to a motion for summary judgment in which they attempt to rebut the complaint's allegations with extrinsic evidence. I will deny the motion to dismiss, which presents issues of fact and requires consideration of documents extraneous to the pleadings. This denial is without prejudice to the renewal of Defendants' contentions in a motion for summary judgment after appropriate discovery.

1

## I.      Summary[1]

### A. Factual Allegations

Defendant Valentiam is a New Jersey corporation that provides clients with (1) expert valuation opinions for businesses and assets and (2) expert witness testimony in litigation and governmental agency proceedings. (2AC at ¶¶ 6, 8.) Within Valentiam, the Valuation Group is tasked with generating "complex valuation reports for large, blue chip corporations" for use in property tax assessments and litigation. (2AC at ¶ 9.) Defendant Hoemke is a partner at Valentiam and a resident of Texas. (2AC at ¶¶ 7, 15, 34.) Plaintiff Munenzon is a former employee of Valentiam and a resident of Connecticut. (2AC at ¶5.)

On November 21, 2016, Economics Partners, LLC ("Economics"), alleged to be the predecessor entity of Valentiam, offered Munenzon a Director position in Economics' Valuation Group. (2AC at ¶¶ 9, 13.) Munenzon negotiated the terms of his employment with Hoemke, who was then a partner at Economics. (2AC at ¶ 15.) Munenzon alleges that during these negotiations, Hoemke drafted and shared with Munenzon a "Business Plan," which incorporated compensation amounts orally negotiated by Munenzon. (2AC at ¶¶ 20-21.) Those compensation amounts were as follows: $120,000 for 2017; $180,000 for 2018, $279,000 for 2019; and $411,773 for 2020. (2AC at ¶ 20.) Munenzon

---

[1]      Citations to the docket will be abbreviated as follows. Citations to page numbers refer to the page numbers assigned through the Electronic Court Filing system, unless otherwise indicated:

"DE" = Docket entry number in this case.

"Compl." = Munenzon's Complaint (DE 1)

"Am. Compl." = Munenzon's Amended Complaint (DE 8)

"2AC" = Munenzon's Second Amended Complaint (DE 22)

"MTD = Defendants' Memorandum of Law in Support of Motion to Dismiss Plaintiff's Second Amended Complaint (DE 24)

"Op." = Brief in Opposition to Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint (DE 25)

"Reply" = Defendants' Reply Brief in Support of Motion to Dismiss Plaintiff's Second Amended Complaint (DE 26)

also negotiated a bonus of fifty percent of his base salary for the years 2018 through 2020, as well as a path to partnership. (2AC at ¶ 20.)

Economics and Munenzon allegedly came to an oral agreement concerning Munenzon's compensation based on the Business Plan. (2AC at ¶ 23.) On January 2, 2017, Munenzon began his employment at Economics, working remotely from his Connecticut residence from his start date until his termination. (2AC at ¶ 13.) Munenzon always reported to Hoemke, while working at Economics and later at Valentiam. (2AC at ¶15.)

Once hired, Munenzon designed "a new, custom process to complete and prepare complex valuation reports for clients" and "built custom software tools to automate many key steps." (2AC at ¶24.) He also hired and trained an offshore team to execute this process. (2AC at ¶ 24.) Munenzon claims that this process allowed his team "to prepare over one hundred complex reports annually on a timely basis at low cost and with very high quality and accuracy." (2AC at ¶25.)

Because of Munenzon's efforts, "Hoemke's time significantly freed up." (2AC at ¶ 16.) However, instead of spending his newfound time growing Economics' business, Hoemke allegedly focused on growing his other business, CrowdReason, LLC ("CrowdReason"), which offers tax software. (2AC at ¶¶ 26-28.) Over the last few years, CrowdReason's tax software business "has grown significantly faster" than Economics' valuation business." (2AC at ¶ 29.) At Munenzon's request, Hoemke promised to focus on Economics' (and later Valentiam's) valuation business, but "ultimately ignored Munenzon's pleas." (2AC at ¶30.) As a result, the valuation business development suffered greatly. (2AC at ¶ 30.)

The 2AC alleges that in the fall of 2018, Peters Advisors merged with Economics' Valuation Group to form Valentiam. (2AC at ¶ 32.) As a result of this merger, Munenzon became a Valentiam employee and continued to report to Hoemke. (2AC at ¶ 39.) Moreover, Munenzon continued to work remotely from Connecticut, although he alleges that Morristown, New Jersey was his "home base" with Valentiam. (2AC at ¶ 39.)

In 2017 and 2018, Economics, and later Valentiam, paid Munenzon his base salary as agreed in the Business Plan. (2AC at ¶ 31.) Munenzon alleges, however, that in 2018, Valentiam delayed payment of Munenzon's bonus "until after it successfully coerced [him] into signing an employment agreement as a condition of receiving his earned and accrued 2018 bonus." (2AC at ¶ 31.) (I will refer to this agreement as the "2018 Agreement".)

Under the 2018 Agreement, Munenzon's annual salary was reduced to $225,000 and did not include an annual bonus. (2AC at ¶47.) Hoemke cited Valentiam's and Munenzon's alleged underperformance as the reason for refusing to pay Munenzon's "base salary and bonus as agreed." (2AC at ¶ 42.) Munenzon, however, attributes "Valentiam's underperformance … to Hoemke's neglect of the business development of the Company's Valuation Group." (2AC at ¶ 42.) Munenzon claims that his own "tangible contribution to Valentiam's [v]aluation business remained critical and at a very high level." (2AC at ¶43.) Indeed, "the Valuation business grew despite Hoemke's lack of attention to it and remained very profitable through the years of [Munenzon's] employment." (2AC at ¶42.)

According to Munenzon, Valentiam's withholding of his earned and accrued bonus to induce him to sign the 2018 Agreement constituted duress sufficient to invalidate the 2018 Agreement. (2AC at ¶ 50.) Munenzon also claims that Hoemke misrepresented the 2018 Agreement as "merely a formality" needed only for "recordkeeping purposes." (2AC at ¶ 51.) Ultimately, Munenzon "relented to Hoemke's pressure and signed the [2018 Agreement] in good faith, hoping that would still be paid as promised." (2AC at ¶ 51.)

Munenzon continued to receive "very strong positive feedback"; "through all the years" Munenzon worked with Hoemke, Hoemke never gave him "a single negative written review." (2AC at ¶ 54.) Despite this, in March 2020, "Hoemke again reneged on promises by refusing to pay Munenzon his earned and accrued bonus for 2019 and refusing to increase his salary for 2020 to $411,773." (2AC at ¶ 59.) In justifying Munenzon's reduced compensation,

4

Hoemke cited the 2018 Agreement and Munenzon's purported underperformance. (2AC at ¶ 59.)

Further, Hoemke "recently"[2] announced that he had discovered a third-party software vendor ("Vendor X"), whose software system would replace a significant portion of Munenzon's system. (2AC at ¶ 61.) According to Munenzon, the Vendor X software lacks "significant functionality" that Valentiam's client reports require, which Munenzon's system provided. (2AC at ¶ 62.) Additionally, the Vendor X software is allegedly "very expensive" and requires manual entry of existing reports, thus increasing the time to complete and the chance of error. (2AC at ¶ 65.)

Munenzon alleges that he apprised Hoemke of the Vendor X software's deficiencies, both in writing and orally. (2AC at ¶ 69.) Nevertheless, Hoemke continued to tell clients that the software was "a technological breakthrough and model of efficiency." (2AC at ¶ 67.) The 2AC asserts that Valentiam's utilization of the Vendor X software resulted in "increased man hours," resulting in more billable hours and revenue for Valentiam at the expense of its clients. (2AC at ¶ 73.) This conduct, Munenzon contends, was in "blatant disregard" of obligations to, and a fraud upon, Valentiam's clients. (2AC at ¶ 74.)

On September 15, 2020, Munenzon complained to Hoemke and Valentiam about their conduct which allegedly violated the CTWPL. (2AC at ¶ 76.) Within days, Munenzon claims, Valentiam retaliated against him for (1) voicing concerns about the Vendor X software and misrepresentations made to clients about said software and (2) complaining about Defendants' conduct "that was violative of the CTWPL." (2AC at ¶ 77.) First, Valentiam placed Munenzon on paid administrative leave and cut his access to the Company's email without written notice. (2AC at ¶ 78.) Second, Valentiam informed Munenzon that upon his return, he would be placed on a Performance Improvement Plan ("PIP"), despite neither Economics nor Valentium ever

---

[2] The 2AC does not allege a specific date.

having issued "a negative written review to him." (2AC at ¶ 79.) Third, on October 21, 2020, two days after Munenzon filed his initial Complaint and before Munenzon could return to work, Valentiam terminated his employment, purportedly for cause. (2AC at ¶ 80.)

### B. Procedural History

Munenzon filed his initial Complaint (DE 1) on October 19, 2020, and the Amended Complaint (DE 8) on November 10, 2020. On August 11, 2021, the Court (1) granted Defendants' motion to dismiss in its entirety pursuant to Fed. R. Civ. P. 12(b)(6); and (2) granted Munenzon's cross-motion to file a proposed second amended complaint as to his breach of contract, fraud in the inducement, and CEPA claims. (DE 20, 21.)

The currently operative 2AC submits revised and renumbered claims for breach of contract; unjust enrichment; breach of implied contract; in quantum meruit; violation of the CTWPL, Conn. Gen. Stat. §§ 31-58, *et seq.* (the "CTWPL"); retaliation in violation of the CTWPL; and retaliation in violation of CEPA, N.J. Stat. Ann. §§ 34:19-1, *et seq.* (SAC at ¶¶ 81-124.)

On September 22, 2021, Defendants filed the motion to dismiss that is now before the Court, arguing that the 2AC, like the Amended Complaint, fails to state a claim and should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6). (DE 24.)

## II. Legal Standards

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007); *see Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 232 (3d Cir. 2008) (Rule 8 "requires a 'showing' rather than a blanket assertion of an entitlement to relief.") (citation omitted). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible

6

on its face." *Twombly*, 550 U.S. at 570; *see also West Run Student Hous. Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 169 (3d Cir. 2013).

That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' … it asks for more than a sheer possibility." *Id.*

Rule 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim upon which relief can be granted. Defendants, as the moving party, bear the burden of showing that no claim has been stated. *Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014).

Generally, "a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *Doe v. Princeton Univ.*, No. 21-1458, 2022 WL 965058, at *3 (3d Cir. Mar. 31, 2022) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)). Where a document, however, is "integral to or explicitly relied upon in the complaint," it "may be considered without converting the motion to dismiss into one for summary judgment" under Rule 56. *Id.* (citing *Doe v. Univ. of Scis.*, 961 F.3d 203, 208 (3d Cir. 2020). For a court to consider such a document, that document must be "undisputedly authentic." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir.1993).

Rule 12(d), Fed. R. Civ. P. governs a case, like this one, in which a defendant who moves to dismiss also submits exhibits and evidence extrinsic to the pleadings in support of its position:

> **(d) Result of Presenting Matters Outside the Pleadings**. If, on a motion under Rule 12(b)(6) or 12(c), matters outside the

7

> pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

Fed. R. Civ. P. 12(d). *See also In re Asbestos Products Liability Litigation (No. VI) (ex rel. Hassell)*, No. 14-1715, at 16–17, 822 F.3d 125, 134 (3d Cir. May 16, 2016). One option, then, is simply to disregard the extrinsic material and treat the matter as an ordinary motion to dismiss. If that option is not taken, however, the court must treat the motion as one for summary judgment. And if it does so, "it must provide the parties 'reasonable opportunity' to present all material relevant to a summary judgment motion." *In re Rockefeller Center Properties, Inc. Securities Litigation*, 184 F.3d 280, 287-88 (3d Cir. 1999) (quoting Fed. R. Civ. P. 12(d)).

### III. DISCUSSION

#### A. Breach of Contract Claim

In moving to dismiss, Defendants submit that Count I (breach of contract) fails as a matter of law. (DE 26 at 9.) Step one of Defendants' argument is that Munenzon has not plausibly alleged that Valentiam is a successor to Economics; therefore, Munenzon's breach of contract claim can only be based on the 2018 Agreement (between Munenzon and Valentiam), and not the prior oral agreement (between Munenzon and Economics). (DE 26 at 9-13.) Step two of the argument is that the breach of contract claim must therefore be dismissed, because the 2AC does not dispute that Munenzon was paid in accordance with the 2018 Agreement. (DE 26 at 15-16.) Defendants assert that the 2018 Agreement is valid and not the product of "economic duress." (DE 26 at 13-15.)

For the reasons described below, the Court denies Defendants' motion to dismiss Count I of the 2AC.

#### 1. Successor Liability

As established in my prior opinion, a purchasing company is generally "not liable for the debts and liabilities of the selling company simply because it

has succeeded to the ownership of the assets of the seller." *Lefever c. K.P. Hovnanian Enterprises, Inc.*, 734 A.2d 290, 292 (N.J. 1999). Nevertheless, successor liability can be established where "(1) the successor expressly or impliedly assumes the predecessor's liabilities; (2) there is an actual or *de facto* consolidation or merger of the seller and the purchaser; (3) the purchasing company is a mere continuation of the seller; or (4) the transaction is entered into fraudulently to escape liability." *Id.* (citing 15 William & Fletcher, Cyclopedia of the Law of Corporations § 7122, nn. 9–15 (1990)). Because the second and third exceptions requires "much of the same evidence," they "are often treated in unison." *Woodrick v. Jack J. Burke Real Est.*, Inc., 703 A.2d 306, 312 (N.J. Sup. Ct. App. Div. 1997).

> In determining whether a particular transaction amounts to a de facto consolidation or mere continuation (*i.e.*, the second and third exceptions), courts typically analyze four factors: (1) continuity of management, personnel, physical location, assets and general business operations; (2) cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible; (3) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; and (4) continuity of ownership/shareholders.

*Id.* (collecting cases). Courts do not require every factor to be present for a de facto merger or continuation to be found. *Id.* The key "inquiry is whether there was an 'intent on the part of the contracting parties to effectuate a merger or consolidation rather than a sale of assets.'" *Id.* (quoting *Luxliner P.L. Export, Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69, 73 (3d Cir. 1993)).

The Court dismissed the Amended Complaint's breach of contract claim because the allegations "simply parrot[ed] the above standards in an effort to plead successor liability." (DE 20 at 28.) Further, the Court observed that "[i]nserting the parties' names into the elements of a claim" was not sufficient to establish successor liability. (DE 20 at 29 (citing *Bell Atl. Corp.*, 550 U.S. at 555; *Phillips*, 515 F.3d at 232).) Nonetheless, Munenzon was granted leave to amend his claim, with the Court stating that any proposed amendment would

9

be given "some leeway" because "the facts about [relevant] corporate arrangements are largely in the control of the Defendants." (DE 20 at 29.)

The 2AC provides numerous new allegations aimed at addressing the deficiencies identified in the Court's previous opinion, including that:

- Hoemke and Plaintiff, who comprised the management team at Economics Partners' Valuation Group continued as management of Valentiam's Valuation Group.

- With respect to … the clients accounting for the overwhelming majority of revenue (AT&T, Comcast, Cox Enterprises ("Cox") and Charter Communications ("Charter"), the services rendered to these clients (property tax valuation), as well as the staff (Hoemke, Plaintiff and Analyst Thomas Coffey ("Coffey") … remained the same.

- The physical location of 4100 Midway Road, Suite 2010, Carrollton, TC 75007 remained the same from Economics Partners' Valuation Group to Valentiam's Valuation Group.

- With respect to the … four of the largest clients accounting for the overwhelming portion of revenues remained the same: AT&T, Comcast, Cox, and Charter.

(2AC at ¶¶ 35-38.)

These allegations, if true, concerning the similarity in management, structure, operations, clients, and locations between Economics and Valentiam could support a finding that there was either (1) a de facto consolidation between Economics' and Peters Advisors or (2) that Valentiam is a mere continuation of Economics. Although Defendants claim that Munenzon "admits that he has no idea about the nature of the Economics Partners/Ryan transaction and how Valentiam came to be" (DE 24-1 at 12), that is hardly surprising considering that the Defendants are largely in control of the documents bearing these issues. (*See* DE 20 at 29.)

In moving to dismiss the 2AC, Defendants argue that the operative complaint does not plead facts supporting "the allegation that Valentiam is the successor-in-interest to Economics Partners." (DE 24 at 9.) For instance, Defendants highlight that the 2AC does not allege "that Economics Partners sold its assets to Valentiam," which precludes any a finding of successor

10

liability. (DE 24 at 11.) Additionally, Defendants contend that Munenzon's allegation—that "Peters Advisors, LLC … merged with Economics Partners' *Valuation Group* to form Valentiam"—is illogical because a merger cannot occur "between a 'practice group' and a corporate entity." (DE 24 at 11) (emphasis added.)

In doing so, however, Defendants ask this Court to consider extrinsic evidence. These documents, they say, demonstrate that (1) no merger occurred between Peters Advisors and Economics and (2) that Valentiam is not Economics' successor. First, Defendants submit a December 5, 2018 press release announcing that Economics "was acquired by another independent company, Ryan." (DE 24-1 at 11 (citing DE 24-6 (Ex. D, Press Release, Ryan Acquires Economics Partners and Expands International Tax Services (Dec. 5, 2018)).)[3] Second, Defendants provide: (1) the Certificate of Formation for Peters Advisors and Valentiam filed in New Jersey on May 18, 2009 and October 22, 2018 respectively; and (2) the Articles of Organization for Economics filed in Colorado on July 7, 2011. (DE 24-7 (Ex. E, Peters Advisors and Valentiam Certificates of Formation); DE 24-8 (Ex. F, Economics' Articles of Organization). These documents purportedly demonstrate that "Economics … and Valentiam are separate companies and were not merged." (DE 24-1 at 12.)

Defendants also submit extraneous documents in support of their argument that there was no "economic duress" in connection with the 2018 agreement. Specifically, Defendants provide emails dated from March 29, 2019 to April 3, 2019, concerning (1) the finalization of the 2018 Agreement between Munenzon and Valentiam and (2) the payment of Munenzon's 2018 bonus. (DE 24-10, Ex. H.)

Defendants ask the Court to review documents not relied on in the 2AC, not merely for the fact of their existence but for their truth value. They ask the

---

[3] The press release describes Ryan as "a leading global tax services and software provider." DE 24-6.

Court to draw legal conclusions from these extraneous documents which are provided in an attempt to factually rebut the allegations of the 2AC.

All of this goes beyond the legitimate scope of a Rule 12(b)(6) motion. One option would be to convert the motion to one for summary judgment under Rule 12(d) and permit Munenzon a reasonable opportunity to respond in kind. *See* p. 8, *supra*. Here, however, I believe that simply permitting a response would be procedurally unfair and would not provide the required "reasonable opportunity" to meet Defendants' proofs. Defendants themselves control the facts and documents concerning Valentiam's formation and/or a transaction between Peters Advisors and Economics (if that indeed occurred). Plaintiff, an individual employee, is unlikely to have access to any such evidence of Defendants' internal corporate arrangements.

In short, at least some discovery will be required to place the parties in a position to litigate the key issues: corporate successorship and, to a lesser degree, duress in connection with the 2018 agreement. Therefore, the Court will deny Defendants' motion because it presents factual issues ill-suited to resolution on a motion to dismiss. After discovery, under the supervision of the assigned Magistrate Judge, Defendants may if appropriate renew their contentions *via* a motion for summary judgment.

### B. Quasi-Contractual Claims

Munenzon also asserts four causes of action sounding in quasi-contract: unjust enrichment against Valentiam (Count II) and Hoemke (Count III), implied contract against Valentiam (Count IV), and quantum meruit against Valentiam (Count IX).

It is true that at some point contractual remedies may supplant quasi-contractual ones. "[U]nder New Jersey law, liability based on quasi-contractual principles cannot be imposed 'if an express contract exists concerning the identical matter.'" *Freightmaster USA, LLC v. FedEx, Inc.*, No. 14-3229, 2015 WL 1472665, at *6 (D.N.J. Mar. 31, 2015) (quoting *Suburban Transfer Serv., Inc. v. Beech Holdings, Inc.*, 716 F.2d 220, 226-27 (3d Cir. 1983)); *see also Meng v.*

*Du*, No. CV 19-18118(FLW), 2020 WL 4593273, at *3 (D.N.J. Aug. 11, 2020).⁴ That point has not yet been reached. Rule 8, Fed. R. Civ. P., permits alternative pleading and "federal courts applying New Jersey law have generally declined to dismiss quasi-contractual claims that are pleaded with express contract claims." *Gap Props., LLC v. Cairo*, Civ. No. 19-20117, 2020 WL 7183509, at *4 (D.N.J. Sept. 17, 2020). Because the breach of contract claim has not been dismissed, Defendants have not established that the 2018 Agreement is, or is the only, "valid and enforceable" contract governing Munenzon's disputed compensation. Therefore, at this juncture, Munenzon's quasi-contractual claims are not redundant, and I will permit them to remain in the case.

Accordingly, the Court denies Defendants' motion to dismiss Counts II, III, IV, and IX of the 2AC.

### C. Remaining Claims

The remaining CTWPL (Counts V and VI) and CEPA claims (Counts VII and VIII) will similarly be denied, for similar reasons. Here, too, Defendants have submitted sets of email exchanges which they believe factually rebut Munenzon's CEPA claims. (*See* DE 24-11, Ex. I; DE 24-12, Ex. J.) For the reasons expressed earlier, I will not consider such documents on this motion to dismiss.

---

⁴ Unjust enrichment, implied contract, and quantum meruit are all quasi-contractual theories that serve as a stopgap in the absence of an express contract governing the parties' performance. *See, e.g.*, *Cushman & Wakefield of New Jersey, LLC v. Wyndham Destinations, Inc.*, No. CV216237SDWLDW, 2021 WL 3030337, at *2 (D.N.J. July 16, 2021) ("[U]njust enrichment and quantum meruit claims … are quasi contractual. Because these quasi-contractual claims arise from the same subject matter as Plaintiff's breach of contract claim, … [they] must be dismissed."); *St. Matthew's Baptist Church v. Wachovia Bank Nat'l Assoc.*, No. 04-4540, 2005 WL 1199045, *7 (D.N.J. May 18, 2005) ("Where there is an express contract covering the identical subject mater of [an unjust enrichment] claim, [a] plaintiff cannot pursue a quasi-contractual claim for unjust enrichment.")

### IV. Conclusion

For the reasons set forth above, I will **DENY** Defendants' motion (DE 26) to dismiss the action. It must be considered as one for summary judgment pursuant to Rule 56, Fed. R. Civ. P. Before such a motion will be ripe for decision, however, the parties must be permitted to conduct discovery. The Court instructs counsel to confer and propose a discovery schedule to Magistrate Judge James B. Clark, III.

Dated: May 10, 2022

/s/ Kevin McNulty

**Kevin McNulty**
**United States District Judge**